**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

MVT SERVICES, LLC, d/b/a/ MESILLA
VALLEY TRANSPORTATION,

      Plaintiff,

v.                                                               Civ. No. 18-1128 GJF/GBW

GREAT WEST CASUALTY COMPANY,

      Defendant.

**ORDER REGARDING DAMAGES, ATTORNEYS' FEES, AND COSTS**

THIS MATTER is before the Court on (1) the Court's Summary Judgment Order [ECF 100]; (2) the Court's Order Denying Defendant's Motion to Amend Answer [ECF 295]; (3) the Court's Findings of Fact and Conclusions of Law [ECF 296] ("FFCL") resulting from the April 11–13, 2022, bench trial; (4) MVT's Motion for Attorney's Fees [ECF 301] ("Motion"); and (5) Great West's Objections to Evidence in Support of Motion for Attorney's Fees and Motion to Strike [ECF 310] ("Motion to Strike").  As set forth below, the Court will (1) **GRANT IN PART AND DENY IN PART** MVT's Motion by awarding MVT a total judgment of **$1,781,210.87** and (2) **DENY** Great West's Motion to Strike.

## I.   MVT IS AWARDED $541,476.84 FOR BREACH OF CONTRACT

In addressing "MVT's breach of contract claim against Great West," the Court's FFCL concluded that "MVT is entitled to recover $541,476.84 in damages."  FFCL at 19 ¶¶ 1–16.  Thus, although "Great West [still] believes that the Court has erroneously awarded $500,000 [of the $541,476.84] in supposed breach of contract damages," ECF 309 ("Fee Resp.") at 13, the Court—

pursuant to its FFCL, which has already resolved this issue—will issue a final judgment awarding

MVT $541,476.84 in damages for its Count One (Breach of Contract) claim [ECF 42 at 7–8].[1]

## II.   MVT IS AWARDED <u>$129,383.54</u> IN PREJUDGMENT INTEREST

"A federal court sitting in diversity applies state law, not federal law, regarding the issue

of prejudgment interest." *Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1288 (10th Cir.

2005) (quotation omitted) (also noting that "[a]n award of prejudgment interest is generally subject

to an abuse of discretion standard of review on appeal" (quotation omitted)).  In Texas, "[d]amages

awarded for breach of contract bear prejudgment interest." *Ellison v. Three Rivers Acquisition*

*LLC*, No. 13-17-00046-CV, 2022 Tex. App. LEXIS 9157, at *38 (Tex. App. – Corpus Christi Dec.

15, 2022).  "Prejudgment interest is compensation allowed by law as additional damages for lost

use of the money due as damages during the lapse of time between the accrual of the claim and

the date of judgment." *Id.* at *38–39 (quoting *Johnson & Higgins v. Kenneco Energy, Inc.*, 962

S.W.2d 507, 531 (Tex. 1998)) (adding that such an award "is governed by the common law").

"For a breach-of-contract claim, prejudgment interest begins to accrue on the earlier of (1) 180

days after the date a defendant receives written notice of a claim, or (2) the date suit is filed." *Id.*

at *39.[2]  In addition, "[p]rejudgment interest in a breach of contract case is calculated as simple

interest and is based on the postjudgment interest rate applicable at the time of judgment." *Id.*[3]

---

[1] The Court issues its Final Judgment [ECF 316] in a separate order.  *See* Fed. R. Civ. P. 58(a) (requiring "[e]very judgment" to be "set out in a separate document").

[2] Regarding the $500,000 paid by MVT towards the settlement of the *Parada* lawsuit due to Great West's "breach[ ] [of] its duty to defend [MVT] in 2013," FFCL at 16 ¶ 50, MVT calculated interest accruing as of December 3, 2018—the date MVT filed the instant lawsuit.  ECF 301-5 at 4.  Regarding the $41,476.84 in legal fees MVT paid to Mr. Blanco as a result of this breach, MVT calculated interest accruing as of February 28, 2016, ECF 301-5 at 4—exactly 180 days after the "September 1, 2015, [date that] MVT tendered to Great West a claim for $41,476.84 in attorney's fees and costs billed by Mr. Blanco in assisting in MVT's defense in the *Parada* Lawsuit."  FFCL at 18 ¶ 65.

[3] *See Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410, 415 (5th Cir. 2011) (noting that "prejudgment interest accrues at the rate for postjudgment interest" and "the applicable [Texas] statute sets postjudgment interest at either [1] 'the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation' or [2] 'five percent a year if the prime rate as published by the Board of Governors . . . is less than five percent'" (quoting,

In applying these standards, MVT seeks a total of $129,383.54 in prejudgment interest (calculated based on date of this Court's Final Judgment, March 31, 2023):

- $114,260.09 corresponding to MVT's ($500,000) settlement payments resulting from Great West's breach of contract; and

- $15,123.45 corresponding to MVT's ($41,476.84) fee payments to Blanco resulting from Great West's breach of contract.

Mot. at 16; ECF 301-5 at 4. MVT's prejudgment interest calculations appear consistent with the Texas prejudgment interest standards, *see* Mot. at 16; ECF 301-5 at 4, and Great West does not oppose these calculations, *see* Fee Resp. The Court's final judgment will therefore award MVT $129,383.54 in prejudgment interest.

## III. MVT IS AWARDED <u>$54,444.62</u> IN PENALTY INTEREST

The Court's FFCL observed that, "[o]n summary judgment, this Court concluded that MVT established each of the [three] elements of its" claim that MVT was liable under the Prompt Payment of Claims Act, Tex. Ins. Code §§ 542.051–.061 ("PPCA"). FFLC at 24 ¶¶ 17–23. "Specifically, the Court determined that (1) on October 28, 2013, MVT tendered the *Parada* Lawsuit to Great West for defense under the Policy; (2) on December 10, 2013, Great West wrongfully denied coverage, therefore establishing liability under the PPCA as a matter of law; and (3) MVT completed its claim under the PPCA when it submitted Mr. Blanco's [$41,476.84 in legal] fees to Great West on September 1, 2015." *Id.* at ¶¶ 18–19. The Court further "conclude[d] that MVT is entitled to recover $41,476.84 plus the statutory amount of penalty interest on these fees and costs." *Id.* at ¶ 19.[4]

---

*inter alia*, Tex. Fin. Code Ann. § 304.003(c)(1)-(2))); *see also* ECF 301-5 at 4 (MVT's prejudgment interest calculations from February 2016 through February 2023—calculations based on the "Section 304.003 judgment rate," which ranged from 5.0 percent to 7.0 percent during this timeframe).

[4] The Court also noted that, although Blanco's $41,476.84 in fees are "recoverable both as a consequential damage of Great West's breach and the proper basis for a claim under the PPCA, MVT is not entitled to double-recover" these fees. Mot. at 25 n.8. In other words, "MVT is entitled only to $41,476.84 plus statutory interest." *Id.* And because

"Under the PPCA, an insurer that is 'liable for a claim under an insurance policy' and fails to *promptly* respond to, or pay, the claim in accordance with the statute becomes liable to the policy holder or beneficiary for the amount of the claim, as well as an 18 percent per annum statutory penalty and reasonable attorney's fees." *Lyda Swinerton Builders, Inc. v. Okla. Sur. Co.*, 903 F.3d 435, 450 (5th Cir. 2018) (emphasis added) (quoting Tex. Ins. Code. §§ 542.051–.061). The insurer's liability for such penalty interest begins once it "delays payment of the claim . . . for more than 60 days." § 542.058. Furthermore, an award of this statutory penalty does not "prevent[ ] the award of prejudgment interest on the amount of the claim, as provided by law." § 542.060(a).

In applying these standards, MVT seeks a total of $54,444.62 in penalty interest (calculated from November 2015 through the date of this Court's Final Judgment). Mot. at 15–16; ECF 301-5 at 3. MVT's calculations appear consistent with the PPCA standards, *see* Mot. at 15–16; ECF 301-5 at 3, and Great West does not oppose these calculations, *see* Fee Resp. The Court's final judgment order will therefore award MVT $54,444.62 in penalty interest under Chapter 542 of the Texas Insurance Code.

## IV.  **MVT IS AWARDED <u>$1,055,905.87</u> IN ATTORNEYS' FEES AND COSTS**

### A.  **Applicable Standards**

"In a diversity case, the matter of attorney's fees is a substantive legal issue and is therefore controlled by state law." *Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P.*, 888 F.3d 455, 461 (10th Cir. 2018) (quotation omitted). "In Texas, as in the federal courts, each party generally must pay its own way in attorney's fees." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 483 (Tex. 2019). "But there are certain circumstances in which

---

the Court has already awarded MVT these $41,476.84 in fees for its breach-of-contract claim, *see supra* Section I, the Court now only addresses MVT's entitlement to the statutory penalty interest.

4

the prevailing party can recover fees from the opposing party." *Id.* at 484.  Specifically, "Texas follows the American rule on attorney's fees, which provides that, generally, a party may not recover attorney's fees unless authorized by statute or contract." *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017) (quotation omitted).

In its FFCL, the Court "conclude[d] that MVT is entitled to recover its reasonable and necessary attorney's fees incurred in the present action pursuant to Texas Civil Practice and Remedies Code § 38.002." FFCL at 27 ¶¶ 24–25; *see also* Tex. Civ. Prac. & Rem. Code § 38.001 (providing that a prevailing party in Texas "may recover *reasonable* attorney[s'] fees from an individual or corporation, in addition to the amount of a valid claim *and costs*, if the claim is for . . . an oral or written contract" (emphasis added)).  In addition, the Court "also determine[d] that MVT is entitled to recover attorney's fees under Texas Insurance Code Chapter 542." FFCL at 27 ¶ 26; *see also* Tex. Ins. Code § 542.060 (providing that a prevailing party in Texas "for a claim under an insurance policy [that was] not in compliance with" the applicable statutory provisions may recover, *inter alia*, "*reasonable and necessary* attorney's fees" (emphasis added)).[5]

## 1. Lodestar Method

"When [such] fee-shifting is authorized, the party seeking to recover those fees bears the burden of establishing the [attorney's] fees are reasonable and necessary." *Nat'l Lloyds*, 532 S.W.3d at 809.  In explaining the "lodestar analysis" for determining reasonable and necessary fees, the Texas Supreme Court has "recently elaborated on the showing an attorney must make to support an award of fees in 'any situation in which an objective calculation of reasonable hours worked times a reasonable rate can be employed.'" *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355 (Tex. 2020) (quoting *Rohrmoos Venture*, 578 S.W.3d at 498).  "In these situations, 'the

---

[5] Although the Court found that "MVT is entitled to recover attorneys' fees under both Chapter 542 and Chapter 38," MVT "is not entitled to double-recover its fees." FFCL at 27 ¶ 27.

fact finder's starting point for calculating an attorney's fee award is determining [1] the reasonable hours worked multiplied by [2] a reasonable hourly rate, and the fee claimant bears the burden of providing sufficient evidence on both counts.'" *Id.* (quoting *Rohrmoos Venture*, 578 S.W.3d at 498). "Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Rohrmoos Venture*, 578 S.W.3d at 498. "This base lodestar figure [i.e., reasonable hours worked multiplied by reasonable hourly rate] should approximate the reasonable value of legal services provided"—i.e., "the calculation should produce an *objective figure* that *approximates* the fee that the attorney would have received had he or she properly billed a paying client by the hour in a similar case." *Id.* (emphasis added).

"[T]he base lodestar calculation usually includes at least the following considerations from *Arthur Andersen*: [1] 'the time and labor required,' [2] 'the novelty and difficulty of the questions involved,' [3] 'the skill required to perform the legal service properly,' [4] 'the fee customarily charged in the locality for similar legal services,' [5] 'the amount involved,' [6] 'the experience, reputation, and ability of the lawyer or lawyers performing the services,' [7] 'whether the fee is fixed or contingent on results obtained,' [8] 'the uncertainty of collection before the legal services have been rendered,' and [9] 'results obtained.'" *Id.* at 500 (quoting *Arthur Andersen & Co. v. Perry Equip. Corp*, 945 S.W.2d 812, 818 (Tex. 1997).[6] "[T]here is a *strong presumption* that the

---

[6] The *Arthur Andersen* factors are "*non-exclusive* factors [used] to guide the fact finder in determining the reasonableness and necessity of attorney's fees." *Rohrmoos Venture*, 578 S.W.3d at 494 (emphasis added). These factors are (with the numbering corresponding to the nine "usual" considerations noted above):

    (a) [1] *the time and labor required*, [2] *the novelty and difficulty of the questions involved*, and [3] *the skill required to perform the legal service properly*;

    (b) the likelihood . . . acceptance of the particular employment will preclude other employment by the lawyer;

[base] lodestar figure is reasonable"—a presumption that may only "be overcome in those *rare circumstances* in which the lodestar does not adequately take into account a factor that may properly be considered."  *Id.* at 502 (emphasis added) (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553–54 (2010)).  Thus, courts may on occasion (as the "second step of the lodestar method") "adjust the base lodestar up or down (apply a multiplier), if relevant factors indicate an adjustment is necessary to reach a reasonable fee"—but such an adjustment "cannot be based on a consideration that is subsumed in the first step of the lodestar method."  *Id.* at 500–01 (adding that the party seeking such an adjustment "bears the burden of providing specific evidence to overcome the presumptive reasonableness of the base lodestar figure").

### 2.  Prevailing Market Rate

"[D]etermining an appropriate 'market rate' for the services of a lawyer is inherently difficult."  *Id.* at 449 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)).  But "because the Texas courts look to many of the same factors as do the federal courts in making attorney-fee

---

(c)  [4] *the fee customarily charged in the locality for similar legal services*;

(d)  [5] *the amount involved* and [9] *the results obtained*;

(e)  the time limitations imposed by the client or by the circumstances;

(f)  the nature and length of the professional relationship with the client;

(g)  [6] *the experience, reputation, and ability of the lawyer or lawyers performing the services*; and

(h)  [7] *whether the fee is fixed or contingent on results obtained* or [8] *uncertainty of collection before the legal services have been rendered*.

*Id.* (emphasis added) (quoting *Arthur Andersen & Co. v. Perry Equip. Corp*, 945 S.W.2d 812, 818 (Tex. 1997)).  "[T]he base lodestar figure accounts for most of the relevant *Arthur Andersen* considerations."  *Id.* at 500; *see also id.* at 496 (observing that "the lodestar method developed as a 'short hand version' of the *Arthur Andersen* factors" and is not "a separate test or method").

awards," *Robinson v. State Farm Fire & Casualty Co.*, 13 F.3d 160 (5th Cir. 1994),[7] this Court also looks to the Tenth Circuit's guidance on determining "the fee customarily charged in the locality for similar legal services." *Rohrmoos Venture*, 578 S.W.3d at 500. The Tenth Circuit considers the following in determining the "prevailing market rate in the relevant community:"

> To determine what constitutes a reasonable rate, the district court considers the prevailing market rate in the relevant community. Plaintiffs must provide evidence of the prevailing market rate for similar services by lawyers of reasonably comparable skill, experience, and reputation in the relevant community. The hourly rate should be based on the lawyers' skill and experience in . . . analogous litigation. If the district court does not have adequate evidence of prevailing market rates for attorney fees, then it may, in its discretion, use other relevant factors, including its own knowledge, to establish the rate. A district judge may [therefore] consider his or her own knowledge of prevailing market rates as well as other indicia of a reasonable market rate.

*Lippoldt v. Cole*, 468 F.3d 1204, 1224–25 (10th Cir. 2006) (quotations omitted). Furthermore, "[u]nless the subject of the litigation is 'so unusual or requires such special skills' that only an out-of-state attorney possesses, 'the fee rates of the local area should be applied even when the lawyers seeking fees are from another area.'" *Id.* at 1225 (quoting *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983)).[8]

### 3. Court's Discretion

"[A]ttorney's fee determinations in federal court are within the district court's discretion." *Id.* at 500 n.12. The Tenth Circuit thus "review[s] the decision to award attorney fees, and the

---

[7] *See also Impact Fluid Sols. LP v. Bariven SA*, No. 4:19-CV-00652, 2022 U.S. Dist. LEXIS 48710, at *8 (S.D. Tex. Mar. 18, 2022) (observing that, in the attorney's fee context, the factors courts consider under Texas and federal law, "for all practical purposes, completely overlap").

[8] *See, e.g.*, *Ramos*, 713 F.2d at 555 (observing—during the attorney's fees portion of "a civil rights class action" case—that "[i]n every major metropolitan area there are a substantial number of lawyers who possess the skill to handle all but the most unusual civil rights cases" and concluding that fees calculations in that case should be based on "the area in which the court sits . . . [at] the time the court awards fees"); *Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995) (concluding—during "the attorneys fees arm of the *Jane L. v. Bangerter* abortion litigation that ha[d] been moving through the federal courts since 1991"—that "the district court did not abuse its discretion in using Salt Lake City rates [and not the prevailing party's requested New York City rates for their New York attorneys] as the basis for identifying reasonable hourly rates").

amount awarded, for abuse of discretion," which "has been characterized as an arbitrary, capricious, whimsical, or manifestly unreasonable judgment"—e.g., a judgment that "relies on clearly erroneous factual findings" or is "without any rational evidentiary basis." *Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227, 1233 (10th Cir. 2018) (quotations omitted) (further observing that "a district court possesses *broad discretion* to award attorneys' fees" and should "provide a *concise* but clear explanation of its reasons for the fee award" (emphasis added) (quotation omitted)).

The Supreme Court has repeatedly "emphasize[d] . . . that the determination of fees should not result in a second major litigation:"

> The fee applicant . . . must, of course, submit appropriate documentation to meet the burden of establishing entitlement to an award.  But trial courts need not, and indeed should not, become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do *rough justice*, not to achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.  And appellate courts must give substantial deference to these determinations, in light of the district court's superior understanding of the litigation.

*Fox v. Vice*, 563 U.S. 826, 838 (2011) (emphasis added) (quotations omitted); *accord Thames v. Evanston Ins. Co.*, 665 F. App'x. 716, 723 (10th Cir. 2016) (unpublished) (observing that "the district court need not identify and justify every hour allowed or disallowed, as doing so would run counter to the Supreme Court's warning that a request for attorney's fees should not result in a second major litigation"—and suggesting that a "general 12 percent reduction" in the total hours would have been reasonable had it been "sufficiently tied to [the] factual findings" (quoting *Malloy v. Monahan*, 73 F.3d 1012, 1018 (10th Cir. 1996))).

### B. Parties' Primary Contentions

#### 1. <u>MVT's Contentions</u>

MVT's Motion contends that MVT is entitled to $1,648,695.87 in attorneys' fees and costs. Mot. at 1–2. Of this amount, MVT argues that it (1) incurred "reasonable and necessary" attorneys' fees (from June 1, 2018, through November 30, 2022) in the amount of $1,564,742.00; (2) *will have incurred* such fees (from December 1, 2022, through March 31, 2023) in the amount of $49,850.00; and (3) incurred $34,105.87 in reasonable costs. *Id.* at 1–2, 11–15. Regarding the main timeframe at issue (June 1, 2018, through November 30, 2022),[9] MVT asserts that "it was reasonable for MVT to work 3,393.2 hours" on this case—particularly in light of "[b]oth the complicated issues involved and Great West's tactics" to which MVT was required to respond. *Id.* at 11–13. In support of this assertion, MVT relies primarily on "[t]he Declaration of John J. Little," which similarly concluded that—"[g]iven the complexity of the issues raised in the Action and the generally uncompromising approach taken by counsel for Great West"—MVT worked such reasonable hours. *Id.* at 11–13 (quoting Little Decl. at 22) (citing, *inter alia*, Little Decl. at 16–18, 22).[10]

MVT further asserts that "[t]he average rate Haynes Boone charged [MVT] was $461.14 per hour" and that this rate is "reasonable for regional and *Dallas-area* attorneys." Mot. at 13–14 (emphasis added); Fee Reply at 2 (asserting that such rates "fall comfortably within th[e]

---

[9] MVT's expert estimates that MVT will have incurred $49,850 in projected attorney's fees from December 1, 2022, through March 31, 2023, ECF 301-1 ("Little Decl.") at 26–27, and MVT incorporates this number in its attorneys' fee calculations. *See* Mot. at 2. MVT's briefing, however, never expressly discusses the $49,850 in projected attorney's fees. *See* Mot.; ECF 312 ("Fee Reply").

[10] Mr. Little also notes, *inter alia*, that MVT "voluntarily reduced its claim for attorneys' fees by approximately $62,000 by limiting its claim to the eight (8) timekeepers for whom it seeks to recover its fees" and "further reduced its claim by excluding certain hours billed by the eight (8) timekeepers and by reducing the hourly rates billed by those timekeepers." Little Decl. at 13, 26 (adding that MVT's attorneys billed it "$1,626,720.50 for [their] legal services," which reflected "3,573.10 hours of time").

customary range and are reasonable and necessary for this matter" (quoting Little Decl. at 23));
*see also id.* at 3 (relying on "Blanco's declaration indicat[ing] that the 'average hourly rates in the
El Paso and southern New Mexico region can range between $350 and $450 or higher, depending
on the lawyer and the complexity of the case being litigated'" (quoting ECF 301-4 ("Blanco
Decl.")))); *but cf.* ECF 257 at 1 (referencing the "September 1, 2015 correspondence between
counsel for MVT and Great West"—showing Blanco's El Paso-based firm billed MVT $200 per
hour for his attorney's fees during 2014–15).[11]   MVT also insists that "the Court is not inflexibly
bound by the hourly rates charged by attorneys in the New Mexico region."  Fee Reply at 3–5.
Specifically, MVT suggests that "the complexity of the issues raised" in this "unusual litigation"
required "special skills" that are only possessed by attorneys outside the El Paso and southern New
Mexico region.  Fee Reply at 4–5 (quotations omitted).

Finally, MVT asserts that "[i]n addition to the fees, [it] incurred $93,692.40 in expenses"—
but MVT "*does not* seek to recover[ ] all its expenses."  Mot. at 14 (emphasis in original).  Instead,
MVT "request[s] only $34,105.87" in expenses and contends that such expenses, "incurred by
MVT for the prosecution of the Action during the period from June 1, 2018, through November
30, 2022, are reasonable, necessary, and customary."  *Id.*  (quoting Little Decl. at 26).  Although
MVT has not included detailed invoices for these expenses, "the amount of recoverable costs are
identified in both the declaration of MVT's fee expert as well as its lead counsel."  Fee Reply at 9
(fist citing Little Decl. at 26, 29; and then citing ECF 301-2 ("Bender Decl.") at 11).

---

[11] The exhibit containing this particular correspondence, which includes Mr. Blanco's confidential invoices to MVT,
is only viewable by the Court.

2.  Great West's Contentions

For its part, Great West contends that "[t]he number of hours worked was unreasonable and excessive." Fee Resp. at 9–13.  For instance, Great West asserts that its own fees were "approximately 25% of the amount incurred by MVT." *Id.* at 9–10.  In addition, Great West notes that "[t]he Bradley Declaration discusses numerous examples of both overstaffing and duplication of effort that resulted in inefficiencies and excess billing." *Id.* at 10.[12]  In addition, Great West asserts that because "MVT was only 33% successful" (i.e., it did not succeed with its bad faith claim, which would have allowed treble damages), "the amount of reasonable and necessary fees should be substantially reduced accordingly." *Id.* at 11–12.  MVT also claims that "[t]he total number of hours billed in the context of MVT's unsuccessful and untenable bad-faith claim is entirely unreasonable and unnecessary." *Id.* at 12 (further asserting that "[t]he charges specifically referring to the baseless [bad faith] claim total $44,379.50" and that "it is likely far more time was expended on this issue than explicitly referenced in the billing").

Great West also contends that MVT's average hourly rate of $461.14 is "excessive and unreasonable." *Id.* at 7–9.  Great West includes the "Declaration of Beth Bradley," which "sets forth numerous cases in this Court, including insurance matters, where the rates found to be reasonable were lower than those sought here"—and where "this Court has reduced rates of $425, $325, and $310 as unreasonably high." *Id.* at 8–9 (citing cases) (also asserting that "[a]s noted by Ms. Bradley, the average rate in New Mexico in 2022 is reported as $244" (citation omitted)).[13]

---

[12] Great West asserts that the Bradley declaration shows that "the vast number of hours were billed by high-rate partners (76.4%) when many of the issues could have been handled by an associate with limited supervision.  Further, a huge amount of billable hours were for 'analyzing' filings as opposed to preparing them, or preparing for meetings far longer than the actual meetings." Fee Resp. at 10 (citation omitted).

[13] Some of the cases Great West cites include the following: *Hall v. SelectQuote Ins. Servs.*, No. 20cv450 MV/GJF, 2021 U.S. Dist. LEXIS 11173, at *11 (D. N.M. Jan 21, 2021) (Fouratt, J.) (finding that "a reasonable hourly rate" in the motion to compel context was "$275 per hour"); *Sant v. Liberty Mut. Ins. Co.*, No. 21cv251-WJ/SMV, 2021 U.S. Dist. LEXIS 187129, at *3–4 (D. N.M. Sept. 28, 2021) (Johnson, J.) (discussing "several cases [that] contextualize

---

12

Lastly, Great West contends that "MVT has not included supporting invoices for the alleged" $34,105.87 in costs. *Id.* at 14. Great West asserts that because "[MVT's] invoices set forth broad categories," "it largely cannot even be determined what the precise charges were for." *Id.* Consequently, MVT "has not provided enough information to meet its burden to show that the fees are reasonable and necessary." *Id.*

## C. Discussion

### 1. MVT Reasonably Worked 3,087 Hours

The Court finds that MVT has not met its "burden of providing sufficient evidence" to show that all of its requested 3,393.2 hours qualify as "reasonable hours worked." *Rohrmoos Venture*, 578 S.W.3d at 498. First, the Court finds that MVT has not shown that the hours it spent litigating its bad faith claim—a claim MVT voluntarily dismissed over three years after filing this suit (but only after Great West sank its own time and money into defending this claim through a motion for summary judgment)—were sufficiently reasonable. *See* ECF 236 at 2 (Great West's motion for summary judgment on the bad faith claim, asserting that MVT "did not bring this instant action until . . . almost five (5) years after Great West's denial of coverage"—but that the bad faith claim was "barred by the applicable [two-year] statute of limitations"). In the context of this litigation, including the total recovery that the Court is authorizing, it would be unreasonable to

---

the appropriate hourly rate in the District of New Mexico," such as cases holding that (1) "$250 and $175 hourly rates were well within the norm in the Albuquerque area, especially for attorneys with 20-plus years of experience"; and (2) an hourly rate for an attorney with "superb trial advocacy skills and [a] status as one of New Mexico's preeminent trial lawyers" could not exceed $350 (citations omitted)); *XTO Energy, Inc. v. ATD, LLC*, No. 14cv1021-JB/SCY, 2016 U.S. Dist. LEXIS 57050, at *108–112 (D.N.M. Apr. 1, 2016) (Browning, J.) (observing that "[t]he Court has approved rates of $300.00 per hour and other judges in New Mexico have found rates of $350.00 per hour reasonable, but most rates in New Mexico are lower"—and, after reviewing numerous cases, observing that "a $400 rate would be close to the top, if not the top of the rates that the court has approved or seen in New Mexico, and that rate has not been for insurance work."). *See also Pierce v. Alt. Specialty Ins. Co.*, No. 16cv829-JAP/KBM, 2017 U.S. Dist. LEXIS 145641, at *8 (D.N.M. Sept. 8, 2017) (Parker, J.) (holding that an attorney who was included in the "Best Lawyers in America" publication "along with dozens of other New Mexico attorneys," had not "demonstrate[ed] that a rate of $500 per hour [was] the prevailing rate in New Mexico"—thus reducing the rate to "$275 per hour, which is a rate this market commands for similar services by lawyers of comparable skill" (citations and quotations omitted)).

essentially require Great West to *again* pay for the time and money spent on this meritless claim. Thus, even though MVT's bad-faith claim may have "[arisen] out of the same nucleus of operative facts as the breach of contract claim," Fee Resp. at 8, time that MVT spent pursuing what turned out to be a dead end was not sufficiently reasonable to require Great West to pay for it.

In its Reply, MVT did not expressly contest Great West's assertions that "[t]he charges specifically referring to the [bad faith] claim total $44,379.50" (i.e., approximately 96 hours of work at MVT's requested average rate)—or that "*far more time* was expended on this issue than [likely] explicitly referenced in the billing." Fee Resp. at 12–13 (emphasis added); *see* Fee Reply at 7–9 (commenting that "Great West identifies only $44,379.50 in fees devoted to the bad-faith claim" and that such fees are "less than 3% of the total fees MVT incurred" and inviting the Court to include such fees in its award in light of their close connection to the contract claim). The Court therefore finds that, given the rate at which MVT amassed ostensibly billable hours in pursuit of its claims, at least 144 of its hours were unreasonably spent pursuing this claim (even if not all such hours were explicitly referenced in the billing records). Consequently, the Court will reduce MVT's requested hours by 144 for its meritless and ultimately abandoned bad faith claim.

Regarding the remaining 3,249.2 hours, the Court "need not identify and justify every hour allowed or disallowed." *Malloy*, 73 F.3d at 1018. The Court finds that MVT has "submit[ted] appropriate documentation to meet the burden of establishing entitlement to an award" for the vast majority of these remaining hours. *Fox*, 563 U.S. at 838. After reviewing Mr. Little's 30-page, single-spaced declaration (plus its 19 pages of exhibits); Mr. Bender's 12-page declaration (plus its 37 pages of exhibits); MVT's 234 pages of billing records; and Ms. Bradley's 13-page declaration, *see* ECFs 301-1 through 301-2; 302; 309-1—and based on its years of experience with this litigation—the Court finds that MVT has met its burden to show that approximately 95 percent

14

of these remaining 3,249.2 hours (i.e., 3,087 hours) were reasonable.  Indeed, it has taken MVT over four years of hard-fought effort in this Court alone to vindicate its contractual rights and receive a judgment from this Court—and such an undertaking has reasonably taken thousands of billable hours.  And it is worth remembering that this case number is not the first but only the most recent in the long-running battle between MVT and Great West arising from a double fatality that occurred nearly ten years ago.  *See* ECF 100 at 1–5 (chronicling the litigation's history).

The Court, however, finds at least some credence in Ms. Bradley's criticisms that a portion of these remaining 3,249.2 hours were "more than is reasonable and necessary."  ECF 309-1 at 13. Specifically, the Court finds that—in a small fraction (approximately five percent) of MVT's overall litigation effort—(1) "[t]he time [appeared] top-heavy, with senior lawyers performing a disproportionate amount of the work" that could have reasonably been performed by less senior attorneys; (2) "[t]here was [some] duplication of effort" or "excessive amount of analysis"; or (3) "[t]here are [some] individual entries that [could] be reduced or eliminated because they lack adequate description, the time [appeared] unnecessary, the work was redundant, or the task [appeared] clerical."  *Id.*  In light of these findings—as well as the Court's granular and intricate knowledge of the litigation, the Court's review of record as described above, and Great West's representation that it billed only "25% of the amount incurred by MVT,"  Fee Resp. at 10—the Court finds that subtracting five percent of the remaining 3,249.2 hours to be a reasonable adjustment to the total hours billed.  The Court will therefore reduce MVT's requested hours by 162.2 hours and find that MVT's counsel reasonably worked 3,087 hours.

### 2.  Hourly Rate of $325 Is Reasonable

The Court finds that MVT's requested $461.14 hourly rate is not "the fee customarily charged in [this southern New Mexico/El Paso, Texas] locality for similar legal services."  *Arthur*

*Andersen*, 945 S.W.2d at 818.  The Court instead finds that—in light of the prevailing market rate for attorney's fees in this locality, *see supra* note 12 (citing cases addressing this rate), as well as the Court's own knowledge of these rates—a $325 hourly rate "constitutes a reasonable rate" for "similar services by lawyers of reasonably comparable skill, experience, and reputation in [this] community." *Lippoldt*, 468 F.3d at 1224.  Although this rate is decidedly on the higher side of the prevailing market rate in this locality, *see supra* note 12, the Court nevertheless finds that it is reasonable in light of skill required to successfully litigate a case such as this.

The Court further finds, however, that "the subject of the litigation" is not "so unusual or requires such special skills that [can be found] only [in attorneys outside of this locality]." *Lippoldt*, 468 F.3d at 1225 (quotation omitted).  Although MVT has hired well-qualified attorneys, MVT has not met its burden of providing sufficient evidence to show that the services its attorneys performed could not have been performed by local attorneys.[14]  Consequently, "the fee rates of [this] local area should be applied even [though] the lawyers [from MVT] seeking fees are from [the Dallas] area." *Id.* (quotation omitted).

### 3.  MVT's Reasonable and Necessary Fees and Costs

The Court therefore concludes that—given MVT's 3,087 reasonable hours and a reasonable hourly rate of $325—MVT's "reasonable and necessary" attorneys' fees from June 1, 2018, through November 30, 2022, are $1,003,275.00.  In assessing the reasonable hours and

---

[14] The Court notes that MVT *chose* this particular venue—and then vigorously contested the transfer of venue to the Western District of Texas.  *See* ECF 22 at 1–2 (denying Great West's motion to "dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(3) for improper venue, or in the alternative, to transfer venue for convenience").  To reap whatever litigation benefits MVT sought by bringing this case in its home district, MVT must also accept the prevailing market rates for similarly-skilled counsel who practice here.  Aside from matching its legal adversary blow-for-blow and round-for-round in a now 51-month slug fest prolonged substantially by a global pandemic, MVT has not shown that this case was so complex or its legal issues so novel as to justify a significant deviation from the market rates in the place it calls home.  The Court's choice of an hourly rate of $325 is a deliberate and informed one based on its 28 years of practice in (or employment by) federal courts, the last seven of which have been in its current capacity and not infrequently involving decisions about reasonable fee awards.

16

hourly rate to arrive at this base lodestar figure, the Court has taken into account the non-exclusive *Arthur Andersen* factors—factors which the Court has thoroughly considered, particularly given its experience with this case, *see supra* note 6 (describing the factors)—and finds that an adjustment to this base lodestar figure to be unwarranted. *See Rohrmoos Venture*, 578 S.W.3d at 500–02 (observing that "there is a *strong presumption* that the [base] lodestar figure is reasonable" unless the case involves "those *rare circumstances* in which the lodestar does not adequately take into account" some "consideration that is [not] subsumed in the first step of the lodestar method" (emphasis added) (quotation omitted)).

The Court also finds that, from December 1, 2022, through March 31, 2023, MVT has reasonably worked approximately 57 of its 82 projected hours.[15]  The Court observes that Great West does not expressly contest MVT's calculations during this four-month timeframe.  *See* Fee Resp.  The Court therefore finds that MVT's "reasonable and necessary" fees for this timeframe are 57 hours x $325/hour = $18,525.00.  In addition, the Court finds that, although MVT did not include detailed invoices corresponding to its request for $34,105.87, it nevertheless submitted sufficient evidence (in the form of Little and Bender's declarations) for the Court to conclude that MVT reasonably incurred at least $34,105.87 in costs from June 1, 2018, through November 30, 2022.  *See* Little Decl. at 26, 29; Bender Decl. at 11.[16]

In sum, the Court finds that MVT incurred reasonable and necessary attorneys' fees and costs in the amount of $1,055,905.87, consisting of:

(1) $1,003,275.00 in fees from June 1, 2018, through November 30, 2022;

---

[15] Specifically, the Court finds that MVT cannot count as reasonable hours the projected time it took to "prepare for Great West's deposition of John Little (5.00 hours)"; "appear at and defend the deposition of John Little (7.00 hours)"; "work with John Little to prepare a supplement to his declaration (7.00 hours)"; or "prepare for and participate in [a hearing with respect to MVT's motion for an award of attorneys'] hearing (6.00 hours)."  Little Decl. at 26–27.

[16] The Court notes that MVT has not asked for any projected costs from December 1, 2022, through March 31, 2023.

(2) $18,525.00 in fees from December 1, 2022, through March 31, 2023; and

(3) $34,105.87 in costs from June 1, 2018, through November 30, 2022.

The Court's final judgment will therefore award MVT $1,055,905.87 in reasonable and necessary attorneys' fees and costs associated with this litigation.

## V.   COURT WILL NOT AWARD CONTINGENT APPELLATE ATTORNEYS' FEES

MVT requests a contingent award of appellate attorneys' fees should it succeed in defending Great West's forthcoming appeal.  Mot. at 16–17; *see Yowell*, 620 S.W.3d at 355 (observing that "[a]n award of contingent appellate attorney's fees to a party is essentially an award of fees that have not yet been incurred" (quotation and alterations omitted)).  But MVT is not required to "first request appellate attorneys' fees in the district court:"

> Under Texas law, if a party is entitled to recover attorneys' fees in the trial court, the party is also entitled to attorneys' fees after successfully defending on appeal. . . .
>
> The Texas Supreme Court has held that a Texas court of civil appeals does not have jurisdiction to initiate an award of appellate attorneys' fees because "the award of any attorney fee is a fact issue which must [first] be passed upon the trial court." In Texas state courts, requesting appellate fees at the original trial is a placeholder requirement to ensure the state trial courts maintain jurisdiction over the issue. *Those are procedural rules that do not apply in federal court.*
>
> [The Fifth Circuit's] local rules provide for appellate litigants to petition [the Fifth Circuit] for appellate attorneys' fees.  [These rules] do[ ] not require a party seeking appellate attorneys' fees to first request appellate attorneys' fees in the district court as a placeholder.

*ATOM Instrument Corp. v. Petroleum Analyzer Co., L.P.*, 969 F.3d 210, 218–19 (5th Cir. 2020) (emphasis added) (citations omitted) (quoting *Int'l Sec'y Life Ins. Co. v. Spray*, 468 S.W.2d 347, 349 (Tex. 1971)) (holding that the party seeking appellate attorneys' fees was not required to "request or prove contingent appellate fees in the original trial" in the district court (quotation omitted)); *accord* 10th Cir. R. 39.2 (establishing the criteria for "*any* motion requesting an award

of appellate attorneys' fees"—and containing no requirement that a party first request appellate attorneys' fees in the district court (emphasis added)).  Furthermore, in the Tenth Circuit, "[t]he district court does not have jurisdiction to award appellate attorney fees in the first instance." *Ridgell-Boltz v. Colvin*, 658 Fed. App'x. 384, 389 (10th Cir. 2016) (unpublished) (citing *Hoyt v. Robson Cos.*, 11 F.3d 983, 985 (10th Cir. 1993)).[17]

In light of these considerations, the Court will not award contingent appellate attorneys' fees.  MVT, however, is "welcome to file a later motion [for appellate attorneys' fees] should [it] succeed again at the [Tenth] Circuit"—and should the Tenth Circuit decide to have this Court determine those fees.  *Agredano v. State Farm Lloyds*, No. 5:15-cv-1067-RCL, 2021 WL 4228340, 2021 U.S. Dist. LEXIS 176702, at *37–38 (W.D. Tex. Sept. 16, 2021).

## VI.  NO NEED TO STRIKE DECLARATIONS OF MESCHES, BLANCO, AND LITTLE

As explained in Section V above, the Court is not awarding contingent appellate attorneys' fees.  Consequently, the Court will deny as moot Great West's request to strike the Mesches declaration [ECF 301-3] addressing appellate attorneys' fees.  *See* Mot. to Strike at 2–4.  Furthermore, the Court already considered but found unpersuasive the substance of Blanco's one-page, cursory declaration [ECF 301-4], which asserted that "average hourly rates in the El Paso and southern New Mexico region can range between $350 and $450 or higher."  *See supra* Sections IV(B)(1) (discussing Blanco's declaration—and contrasting it with the fees Blanco charges for

---

[17] *See also Hoyt*, 11 F.3d at 985 ("hold[ing] that the district court did not have jurisdiction to award appeal-related attorneys' fees" in light of the Tenth Circuit's "*long-standing tradition* of considering appellate-level attorney's fees only following a proper application to [the Tenth Circuit]"—and further observing that (1) "the trial-level and appellate-level attorney fee issues [are analyzed] separately"; (2) "a 'prevailing party' [at the district court level] is not automatically entitled to an award of appeal-related attorneys' fees"; (3) "[r]egardless of the award of trial-related attorneys' fees, [the Tenth Circuit has] exercised [its] discretion on whether to award appeal-related attorneys' fees"—and that such discretion is, "[a]bsent an explicit provision," exercised pursuant to "an application for appeal-related attorneys' fees [that has been] first be made to [the Tenth Circuit]"; and (5) "[s]hould [the Tenth Circuit] decide that it is appropriate to award such fees, [it] may then remand to the district court to determine an award of reasonable fees" (emphasis added)).

this region), (C)(2) (hourly rate analysis, concluding that $325 was a reasonable hourly rate).  The Court will therefore deny as effectively moot Great West's request to strike Blanco's declaration. *See* Mot. to Strike at 2–4.

The Court will also deny Great West's request to strike Little's declaration as "not meet[ing] the requisite expert standards" under Federal Rule of Evidence 702.  *Id.* at 4–6.  In granting MVT's request to designate a post-trial expert to opine on the "reasonableness and necessity" of the attorneys' fees [ECF 66], the Court stated:

> [T]he Court is not convinced that [the disclosure of a post-trial expert on attorneys' fees] was required under Rule 26. By its plain language, the expert-disclosure obligation applies to "witnesses" a party "may use at trial." Fed. R. Civ P. 26(a)(2). From the representations of the parties, the expert in question will not testify at trial and therefore falls outside the ambit of disclosure under Rule 26.

ECF 93 at 1–2; *see also. Borandi v. USAA Cas. Ins. Co.*, No. 2:13-CV-141-TS, 2015 U.S. Dist. LEXIS 20184, at *3 (D. Utah Feb. 18, 2015) (observing that "Defendant points to nothing that would require expert testimony to support a claim for attorney fees").  Furthermore, to the extent that Little must be qualified as an expert for the Court to consider his declaration—and the Court is not aware of, and Great West has cited no authority to support, such a rule, *see* Mot. to Strike— the Court finds and concludes that Little qualifies as such an expert.

Under the Federal Rules of Evidence, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if four conditions are met:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In applying this standard, the court must "first decide whether the proffered expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) (quoting Fed. R. Evid. 702).  Second, "the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Id.* (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also Nacchio*, 555 F.3d at 1241 (stating that "the district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact" (internal quotations marks omitted)).

The Court finds that, pursuant to his "knowledge, skill, experience, training, [and] education," Fed. R. Evid. 702, Little is qualified to render an opinion as an expert on attorneys' fees.  *See, e.g.*, Mot. at 11 (observing that Little "graduated from Yale Law School, has practiced civil litigation for more than 39 years, worked at multiple firms, and serves as the Court-appointed examiner for a major bankruptcy case" in which he has "seen 74 fee applications submitted to the court, giving him an exceptional vantage point for determining a fee request's reasonableness" (citing Little Decl. at 2–3)).  The Court further finds that Little's declaration is "reliable and relevant."  Little clearly has specialized knowledge in this area, his testimony is based on sufficient

records of MVT's fees, and he applies reliable principles and methods in opining on whether

MVT's requested fees and costs are reasonable and necessary.  As summarized by MVT:

> Little's declaration helpfully identifies for this Court, with granular detail for each
> of the [lodestar] categories analyzed: "What particular services were performed";
> "Who performed the services"; "When was the work performed"; "The reasonable
> amount of time to perform the services"; "The reasonable hourly rate for each
> person performing services"; "The base lodestar figure"; "Other considerations"
> Little took into account; and whether an "[e]nhancement or reduction of the lodestar
> figure is warranted."  After this extensive analysis, the final four pages of Little's
> declaration provide Little's opinions, the fees and expenses MVT incurred, fees in
> the event of an appeal by Great West, Little's compensation, and the work Little
> has done as well as future work.

ECF 313 at 5–6.

In light of the foregoing, the Court will deny Great West's Motion to Strike.  The Court

evaluated Little's declaration along with all other evidence and gave it only the weight it believed

his opinions deserved.

**VII. CONCLUSION**

**IT IS THEREFORE ORDERED** that MVT's Motion for Attorney's Fees [ECF 301] is

**GRANTED IN PART** in that the Court's Final Judgment [ECF 316] will award MVT judgment

in the amount of **$1,781,210.87** as follows:

(1) $541,476.84 for MVT's breach of contract claim;

(2) $129,383.54 in prejudgment interest;

(3) $54,444.62 in penalty interest; and

(4) $1,055,905.87 in attorneys' fees and costs.

**IT IS FURTHER ORDERED** that MVT's Motion for Attorney's Fees [ECF 301] is

otherwise **DENIED**.

**IT IS FINALLY ORDERED** that Great West's Motion to Strike [ECF 310] is **DENIED**.

**SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***